IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 19-cv-01878-RBJ

JAMES B. JOHNSON,

      Plaintiff,

v.

HEWLETT PACKARD ENTERPRISES COMPANY, d/b/a Hewlett Packard Enterprise, and
HEWLETT PACKARD ENTERPRISE LONG TERM DISABILITY PLAN,

      Defendants.

---

## ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

      This is an ERISA case in which plaintiff seeks long-term disability benefits under his

former employer's plan. Before the Court is plaintiff's motion for summary judgment. ECF No.

53. For the reasons discussed below, the motion is GRANTED. I reverse the denial of benefits

and remand to the administrator for further consideration consistent with this order.

### I. FACTUAL BACKGROUND

      Plaintiff James B. Johnson is a former employee of defendant Hewlett Packard

Enterprises Company ("HP"). HP employed Mr. Johnson as an IT Customer Service

Representative starting in April 2001. ECF Nos. 1 at ¶6; 15 at ¶6. He has not worked since

March 15, 2016. ECF No. 1 at ¶23. Sedgwick CMS served as the claims administrator for HP's

Disability Plan at the time of plaintiff's employment, and Sedgwick was responsible for the

denial of benefits that led to this lawsuit. *Id.* at ¶¶8–9; ECF No. 15 at ¶¶8–9.

A.  **Plaintiff's medical history**

The records in this case start in 2016 with notes from Dr. Michael Noble, plaintiff's primary care provider.  Mr. Johnson reported a variety of medical challenges, but the most pressing—and the one most relevant to this case—was stiffness, numbness, and pain in his back, neck, hands, and feet.  *See, e.g.*, ECF No. 31-10 at 94.  These symptoms worsened, and in March 2016 Dr. Noble diagnosed plaintiff with rheumatoid arthritis ("RA").  ECF No. 30-6 at 81.  He completed an Attending Physician Statement of Long-Term Disability ("APS") on March 16, 2016.  *Id.*  He indicated that the RA was an "extreme onset," that plaintiff was unable to work at the time, and that he would be prevented from working through May 2, 2016.  *Id.* at 82.

Dr. Noble referred Mr. Johnson to Dr. Dominik Sokalski, a rheumatologist at Colorado Springs Health Partners.  ECF Nos. 31-10 at 94; 28-2 at 2.  Mr. Johnson first saw Dr. Sokalski on June 7, 2016.  He assessed plaintiff as having RA, noting "active disease" and several positive RA test results such as a rheumatoid factor ("RF") of 160 (normal less than 15 IU/ml) and a cyclic citrullinated peptide ("CCP") of 250 u/mL (normal less than 20 u/mL).  *Id.*  Mr. Johnson continued to see Dr. Noble and Dr. Sokalski throughout the remainder of 2016 and into spring of 2017.  *See, e.g.*, ECF No. 31-10 at 96–100.  During that time plaintiff's RA diagnosis stayed consistent, and he tried various medications to manage his condition, such as Humira and steroid injections.  Mr. Johnson did not see substantial improvement in his symptoms.  *Id.*

Dr. Sokalski filled out an APS on April 25, 2017.  ECF No. 29-4 at 31–32.  He diagnosed Mr. Johnson with "seropositive RA" and fibromyalgia, noting subjective symptoms of "diffuse joint pain, fatigue, muscle pain/spasms."  When discussing the effect of Johnson's impairment on

his job, Sokalski wrote, "[h]is current limitations are due to fibromyalgia rather than RA."[1]  He also noted that he expected the condition to improve by July 25, 2017 (three months later).  *Id.*

On April 28, 2017 Dr. Noble completed a new APS.  ECF No. 29-4 at 38–39.  He indicated that Mr. Johnson had improved, but he limited him to one hour each of walking, standing, and sitting each day.  When asked to explain how the condition affected Mr. Johnson's ability to work, he wrote, "severe flare up from Rheumatoid arthritis and myalgias."  *Id.* at 39.  He opined that plaintiff would improve, but it was unclear when.  *Id.*

On July 7, 2017 plaintiff began seeing Dr. Corbett, another rheumatologist, after Dr. Sokalski's clinic closed.  ECF No. 31 at 84–87.  For plaintiff's RA he stated that "[s]ymptoms are persistent and significantly disabling, despite maintenance treatment with Humira after almost a year of therapy.  Humira has effectively controlled joint swelling but symptoms of pain and stiffness not as well controlled and are still disabling."  *Id.* at 85.  Later in his notes Dr. Corbett noted that plaintiff had pain mostly in his hand and finger joints, swelling in his thumbs, tenderness and slight swelling in some finger joints, and trouble with hand closure in the morning.  *Id.* at 87.  He indicated that Mr. Johnson was limited to four hours each of standing, sitting, and walking each workday, and that he did not expect his chronic condition to improve.  ECF No. 29-3 at 13.  On January 17, 2018 Dr. Corbett saw plaintiff again.  Plaintiff reported no improvement in the pain in his hands and feet.  However, a subsequent electromyography ("EMG") test showed no abnormalities.  ECF No. 28-6 at 12.

Dr. Noble examined Mr. Johnson again on February 6, 2018.  ECF No. 29-2 at 70.  He

---

[1] For whatever reason, HP's LTD plan excludes fibromyalgia from consideration in determining an employee's disability.  ECF No. 54-4 at 12.  However, because Sedgwick ultimately accepted plaintiff's RA diagnosis, this physician's contrasting diagnosis of fibromyalgia is not relevant to the Court's analysis here.-

wrote, "RA involving multiple sites / Peripheral neuropathy; Symptoms worsening in his hands, both feet with numbness, tingling, and burning sensation. Continue to follow up with rheumatologist . . . ." *Id.* Later he added that "[Johnson] still wakes up stiff in the mornings for at least 4-6 hours," and that plaintiff was not currently working, could not do any manual labor or type, and could not drive for very long due to increased pain. *Id.* at 71. That same day Dr. Noble completed a new APS. Dr. Noble restricted Mr. Johnson to "no lifting, no repetitive or heavy manual labor, no typing." He limited plaintiff to one hour each of sitting, standing, walking, and lifting. ECF No. 28 at 31–32. On February 12, 2018 Dr. Corbett indicated that he was seeing "partial improvement" with plaintiff's RA treatment, but that he considered the condition totally or permanently disabling, and that he did not recommend a return to work even with restrictions. ECF No. 31-10 at 112.

On March 13, 2018 Mr. Johnson met with Dr. Annu Ramaswamy for an Independent Medical Examination ("IME") at Sedgwick's direction. ECF No. 31-10 at 91–110. In his report Dr. Ramaswamy summarized all of the medical records provided to him, including those from Dr. Noble, Dr. Sokalski, and Dr. Corbett. He noted that plaintiff's titer levels were "fairly elevated at the time of his diagnosis," but that hand X-rays since then "did not reveal any type of erosive arthopathy/joint destruction." *Id.* at 104. Dr. Ramaswamy then completed a direct physical examination of Mr. Johnson. Among other things he indicated that plaintiff "presented with his fingers clenched," which would worsen symptoms, and that he was unable to detect significant swelling in his hand or wrist joints—only "slight" or "trace" swelling in a few joints. *Id.* at 106. His assessment was that Mr. Johnson had "fairly inactive rheumatoid arthritis" given the lack of objective evidence of synovitis, which was "minimal at best." *Id.* at 107.

Dr. Ramaswamy recommended that, to minimize significant RA flares in the future, Mr. Johnson "type in 20-minute cycles with 20-minutes of no typing between the 20-minute typing cycles." *Id.* at 108. He believed Mr. Johnson could occasionally pinch both hands about one-third of the day. He did not recommend any restrictions for lifting, carrying, pushing, pulling, walking, standing, sitting, crawling, kneeling, squatting, and climbing. *Id.* at 108. In other words, the only restriction this IME suggested was that Mr. Johnson type in 20 minutes on, 20 minutes off cycles, for no more than four hours in an eight-hour day. He disagreed with the more extensive restrictions recommended by Drs. Noble and Corbett. *Id.* at 108–09.

Dr. Corbett completed a Residual Function Capacity ("RFC") evaluation of Mr. Johnson on April 30, 2018. ECF No. 31 at 6–9. He listed RA as the diagnosis, and he noted the following objective symptoms of the condition: joint warmth, reduced grip strength, sensory changes, impaired sleep, swelling, and muscle spasms. He also noted symptoms of weakness in extremities, pain, fatigue, stiffness, decreased range of motion, and chest pain. Dr. Corbett indicated that Mr. Johnson was not a malingerer, meaning he did not make up his symptoms or pretend to be impaired, and that Mr. Johnson's emotional state did not contribute to the severity of his symptoms or functional limitations. *Id.* He opined that Mr. Johnson was constantly in pain severe enough to interfere with his concentration and attention. Finally, he determined that Mr. Johnson could sit and stand less than two hours per eight-hour workday (for four hours sitting and standing total), that he would need regular breaks, and that he would be absent from work more than four days per month due to his impairments or treatment. *Id.* at 7.

Dr. Noble agreed with Mr. Corbett's entire assessment. *Id.* at 5. He also noted that Dr. Corbett was retiring, and plaintiff would need to find yet another rheumatologist. ECF No. 28-6

at 10. Dr. Corbett saw Mr. Johnson a final few times in May and June 2018. He indicated that plaintiff had significant improvements in pain and swelling after about two to three weeks of taking Xeljanz for his RA. *Id.* at 12–13.

On June 21, 2018 plaintiff met with Dr. Theis, a new rheumatologist. After physically assessing plaintiff for RA, Dr. Theis concluded that he was "normal," and that there was "no evidence for acute or chronic synovial inflammation." ECF No. 28-8 at 103. Because of this, he wrote that he could not confirm "if this is genuine RA or a false positive test." *Id.* at 104. He suggested an MRI for plaintiff's right hand and a diagnostic lab workup. *Id.*

On July 26, 2018 plaintiff met with Dr. Noble again. Plaintiff's MRI results from this visit showed no sign of acute or chronic synovial inflammation. He also noted other signs that the RA was less active, such as no destructive changes in the joints in either hand. He also opined that a lot of plaintiff's symptoms were due to anxiety. ECF No. 28-6 at 10–11.

On August 30, 2018 Occupational Therapist Kristine Crouch completed a Functional Abilities Evaluation ("FAE") on Mr. Johnson. ECF No. 29 at 66–96. This was a fairly extensive assessment of plaintiff's ability to sit, stand, walk, bend, crouch, squat, lift, grip, reach, and use his fine motor skills. Ms. Crouch noted significant limitations in many of these areas, such as limitations in motor dexterity, joint redness, and swelling in his fingers and wrists. She wrote that "Mr. Johnson's functional tolerances and capacities vary secondary to pain, fatigue and joint limitations (including redness/swelling) secondary to rheumatoid arthritis. The symptoms and limitations of this auto-immune disease vary in intensity and location. As such, the limitations fluctuate throughout the day and on a day-to-day basis." *Id.* at 71. She concluded that plaintiff was no longer capable of working as an IT Account Delivery Manager for HP, nor did he appear

able to secure or maintain employment "in any capacity on a full-time basis." *Id.*

Mr. Johnson began seeing Dr. Isabelle Amigues at the National Jewish Rheumatology Clinic on August 22, 2018. She wrote that he presented with "2 years of inflammatory arthritis and a diagnosis of seropositive for rheumatoid factor . . . Today he presents with severe disease activity as evidenced by significant number of synovitis on exam and several hours of morning stiffness on Plaquenil 400 mg daily." ECF No. 31-1 at 197. Mr. Johnson saw Dr. Amigues again in early November 2018. She noted nothing new in his condition. ECF No. 30-9 at 48.

Finally, on November 28, 2018 Mr. Johnson underwent a second IME at Sedgwick's behest, this time conducted by Dr. Robert Broghammer. ECF Nos. 28-5 at 96–97; 28-6 at 1–23. Similarly, to Dr. Ramaswamy, Dr. Broghammer reviewed plaintiff's entire medical file, which by that point consisted of over 2,300 pages. His summarizing of the records was even more detailed than Dr. Ramaswamy's. *See* ECF No. 28-6 at 1–17. He also reviewed the prior IME report by Dr. Ramaswamy and medical records plaintiff submitted between the time of that report in March 2018 and his own in November 2018. Like the prior IME, Dr. Broghammer conducted a physical examination of Mr. Johnson. He noted "normal appearance" of his hands with "no evidence of swelling and no synovitis," as well as no redness. He also indicated that plaintiff had full range of motion in his fingers and wrists. *Id.* at 19.

When asked about plaintiff's functional impairments, Dr. Broghammer agreed with Dr. Ramaswamy's limitation of 20 minutes on, 20 minutes off typing cycles. He stated

> My physical examination does not confirm any active synovitis or significant joint or soft tissue swelling with the majority of the claimant's problems confined to subjective complaints. However, prior clinicians have established synovitis of the hands which would impact functionality. It should be noted that synovitis is not always present in Rheumatoid arthritis and may appear intermittently.

*Id.* at 20. He further determined that "this disease entity appears to be quiescent clinically." *Id.* at 20–21. As Dr. Ramaswamy did, Dr. Broghammer concluded that plaintiff was not as functionally impaired as his attending physicians said. He did nonetheless state that Mr. Johnson's positive RA laboratory studies "strongly suggest[] that he will develop active rheumatoid arthritis in the future." *Id.* at 22–23. Dr. Broghammer's report appears to be the last major record that Sedgwick considered in its eligibility determination. *See* ECF No. 30-8 at 206.

**B. The Employability Assessment Report ("Meyers Report")**

On May 29, 2018 Sedgwick commissioned an Employability Assessment Report from Meyers Vocational Consulting Services, LLC (the "Meyers Report"). ECF No. 28-3 at 21. The purpose of the report was to identify what jobs, if any, plaintiff could do with his existing limitations. The report was dated March 31, 2018. *See* ECF Nos. 29-1 at 70–71; 29-2 at 1–3. Mr. Meyers was tasked with identifying jobs within the national economy located within fifty miles of plaintiff's house, and with an income equal to or greater than his monthly LTD benefits. ECF No. 29-1 at 70. In terms of medical evidence, he appears to have reviewed only Dr. Ramaswamy's IME. He also reviewed plaintiff's educational background and work history.

Mr. Meyers noted Mr. Johnson's job duties as follows (from a May 24, 2016 email):

- Develops and fosters senior management relationships with the customer and excellent customer satisfaction.
- Understands customer at local, county, region, and worldwide (WW) level to analyze delivery requirements.
- Develops strategies and processes with the customer in areas such as performance metrics and measure, escalation change management and communication.
- Owns cost target commitments for all service delivery requirements developing, implementing, and monitoring expense controls.
- Hires and leads cross functional team including 3rd party vendors to ensure performance goals are met for all in scope services across all towers.
- Identifying and analyzing gaps to develop and implement corrective action plans.

- Develops and leads Account Service Team (AST) and all delivery organizations to timely, cost effective delivery of compliance to Service Level Agreements (SLA) requirements identifying and recommending optimization.
- Develops and manages account service delivery plan.
- Contributes to strategic account plan.
- Consults in presales and change order negotiations, representing, and approving delivery capability and cost solution.
- Acts as Account Delivery Manager (ADM) in medium to large engagements or small portfolio of engagements.
- Leads a medium to large AST/delivery team with multiple towers/business represented.
- Member of onsite leadership team in Denver, Colorado.
- Onsite responsibilities for infrastructure.
- Customer facing, onsite at customer offices and data centers in Denver area on request.

*Id.* at 71; ECF No. 29-2 at 1.  The physical demands for the job were described as:

> This job is a typical office job – work is in an office setting in downtown Denver (that location is require [sic] for this role, 100% of the work week).  The person in the job needs to be able to travel to the customer's facility (driving their own vehicle typically).  There are no core job requirements to lift and carry items at a certain weight or use ladders.  Again, it's a typical office job.

ECF No. 29-2 at 1 (quoting an email from May 25, 2016).  The Meyers Report then concluded

the following about plaintiff's restrictions:

> The referral letter from Sedgwick CMS indicated the claimant has the following work restrictions: "Restrictions recommended to minimize significant RA flares in the future: no continuous typing, type in 20 minute cycles with 20 min of no typing between the 20 min typing cycles, occasionally pinch 1/3 of the day (both hands)."

> The restrictions noted above do not restrict Mr. Johnson's ability to sit, stand, or walk.  Similarly, he is not restricted in terms of exertion (lifting or carrying).  The restriction concerning typing allows for keyboarding up to 40 minutes per hour which would equate to a full, frequent range of keyboarding.  The restriction to only occasional bilateral pinch [sic] would restrict activities such as writing and paper handling.  There is no indication that the Claimant is restricted from using a mouse.

> The Claimant can perform the occupation of Global Manager within his current restrictions.  He can also perform his own occupation of a SVC-ITO Service Delivery within his current restrictions.

*Id.* at 2.  In sum, the Meyers Report concluded that Mr. Johnson could perform both the Global

Manager role and his own former role at HP despite his typing restriction.

### C. HP's disability policy and determination of plaintiff's eligibility

During his employment Mr. Johnson was part of the Hewlett Packard Enterprise Disability Plan ("the plan"). *See* ECF No. 54-4. Though the plan is technically HP's, HP outsources determination of eligibility for benefits to a claims administrator. Section 9(a) of the Plan, under "Administration and Operation of the Plan," reads as follows:

> The Company is the "plan sponsor" and, except as otherwise provided herein, the Company, or any proper delegate of the Company, is the "plan administrator," as such terms are used in ERISA. The Company, in its capacity as the plan administrator, is the named fiduciary which has the discretionary authority to determine eligibility for Plan participation and entitlement to Plan benefits in accordance with the terms of the Plan; *except that with respect to the determination of entitlement to Plan benefits (including initial claims and review of appeals), such discretionary authority is delegated to the Claims Administrator, and such Claims Administrator shall perform its services as a named fiduciary.*

ECF No. 54-4 at 36 (emphasis added). Under the "Definitions" section, "Claims Administrator" is defined as Sedgwick CMS. *Id.* at 7.

There are three different phases for disability benefits eligibility, and each has different requirements for an individual to be considered "totally disabled" due to injury or sickness:

> (i) During the first twenty-six (26) weeks following the onset of the injury or sickness, the Participant is unable to perform with reasonable continuity the Essential Functions of the Participant's Usual Occupation at the Participating Company. 'Essential Functions,' as used herein, shall mean those functions that are required for the performance of an occupation and that cannot be reasonable [sic] omitted or modified.

> (ii) After the initial twenty-six (26) week period and prior to the end of the initial twenty-four (24) month period following the onset of the injury or sickness, the Participant is unable to perform the Essential Functions of his Own Occupation.

> (iii) Following the initial twenty-four (24) month period after onset of the injury or sickness, the Participant is continuously unable to perform any occupation for which he is or may become qualified by reason of his education, training or experience. . . .

ECF No. 54-4 at 11–12.

Mr. Johnson applied for disability benefits under the plan sometime in 2016. Sedgwick approved benefits for Mr. Johnson for two years under the phase (ii) eligibility requirements mentioned above. ECF No. 28-1 at 213–214. Mr. Johnson began receiving benefits in March 2016, and his benefits ended on March 18, 2018. *Id.* at 213.

On December 15, 2017 Sedgwick informed Mr. Johnson that they were evaluating his eligibility for benefits beyond the initial two-year period, and that to receive benefits he would need to meet the higher standard under phase (iii). *Id.* at 214. That standard required objective medical evidence of an impairing condition that prevented him not only from doing his former occupation, but also "any occupation for which he is or may become qualified by reason of his education, training or experience." *Id.*; *see also* ECF No. 54-4 at 11. Sedgwick requested more medical records to evaluate the claim, and Mr. Johnson complied. ECF No. 28-7 at 31.

In March 2018 Mr. Johnson underwent his first IME. Following those results, on April 3, 2018 Sedgwick denied plaintiff's claim for LTD benefits. ECF No. 29-2 at 6–9. Mr. Johnson appealed the adverse determination on October 1, 2018. ECF No. 28-7 at 31. He sent updated medical records to Sedgwick after that denial, and Sedgwick then had Mr. Johnson undergo the second IME with Dr. Broghammer. ECF Nos. 28-5 at 94, 96; 30-9 at 42–54.

On December 31, 2018 Sedgwick issued its final denial of LTD benefits. ECF No. 30-8 at 204–08. The decision listed the medical documents that Sedgwick reviewed in evaluating Mr. Johnson's claim, and it summarized the conclusions Drs. Ramaswamy and Broghammer reached about his RA and restrictions. It then noted that plaintiff's file was referred to a vocational specialist (Mr. Meyers), and that the Meyers Report concluded that plaintiff could perform his

prior work in ITO Service Delivery and also work as a Global Manager. Based on this Sedgwick wrote, "[t]he documentation in [sic] file shows that Mr. Johnson is able to perform work in any occupation given the restrictions provided by the independent examination that was performed on March 13, 2018." *Id.* It then reasoned that because the file did not support plaintiff's inability to work, "we have no alternative other than to reaffirm denial of benefits . . . ." *Id.* at 207. In essence, then, Sedgwick accepted and adopted wholesale the conclusions set out in the Meyers Report about plaintiff's employability, and it denied LTD benefits on that basis.

## II. PROCEDURAL BACKGROUND

Following the final denial, Mr. Johnson filed this case on June 27, 2019. ECF No. 1. HP filed the Administrative Record—over 7,000 pages long—in May 2020. ECF Nos. 28, 29, 30, and 31. On September 16, 2020 plaintiff moved for summary judgment. He seeks reinstatement of benefits from March 2018 to the present, interest, costs, and attorney's fees. In the alternative, he seeks a reversal of the denial and remand for further consideration. ECF No. 53 at 20.

## III. ANALYSIS

In an ERISA case in which both parties move for summary judgment, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Bard v. Bos. Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006)). I thus review the administrative record to determine if I should affirm the denial of benefits or remand. First, however, I address the parties' dispute as to which standard of review applies.

**A. Which standard of review applies**

      1. Whether the Plan vested discretion in Sedgwick

In *Firestone Tire & Rubber Co. v. Bruch*, the Court stated that ERISA denial of benefits

claims are "to be reviewed under a *de novo* standard unless the benefit plan gives the

administrator or fiduciary discretionary authority to determine eligibility for benefits or to

construe the terms of the plan." 489 U.S. 101, 115 (1989). An abuse of discretion standard—

also known as the arbitrary and capricious standard—is appropriate when plan administrators

have discretionary authority. *Id.*

      Under ERISA a plan administrator may delegate fiduciary authority in accordance with

the express instructions contained in its plan document. 29 U.S.C. § 1105(c)(1). The first

question before me is thus whether HP has carried its burden of proving that its plan vested

Sedgwick, the purported administrator, with discretionary authority to determine eligibility for

benefits. Mr. Johnson argues that this is a case of de novo review because there has been no

grant of discretionary authority to Sedgwick. ECF No. 53 at 2. His entire argument is premised

on his assertion that HP has never produced a copy of its Summary Plan Description ("SPD") to

plaintiff, nor did HP include it in the administrative record. Because the SPD has not been

produced, he asserts, there is no evidence that HP delegated its discretion to Sedgwick.

      Mr. Johnson's argument is belied by the plan document. The language of the plan (and I

refer to the plan itself here, not the SPD) expressly delegates discretionary authority to determine

entitlement to benefits to the "Claims Administrator," and it then names Sedgwick as the claims

administrator. ECF No. 54-4 at 36. This language complies with 29 U.S.C. § 1105(c)(1). Judge

Arguello in this district has also concluded that this same plan and language grants Sedgwick

discretionary authority. *Daily v. Hewlett Packard Co.*, No. 13-CV-02502-CMA-CBS, 2014 WL 5489085, at *5 (D. Colo. Oct. 29, 2014). That Mr. Johnson never saw this language prior to HP's filing its response does not negate Sedgewick's discretionary authority—he has presented no law suggesting this is the case, nor have I found any.

Even if Mr. Johnson had not seen language explicitly delegating this authority to Sedgwick, he knew Sedgwick was in charge of determining his benefits eligibility. He received multiple letters indicating that Sedgwick had this role. *E.g.*, ECF Nos. 28-1 at 9; 28 at 213–14; 28-1 at 12; 28 at 128. In addition, he and his attorney both communicated *to* Sedgwick about his claim, further demonstrating that plaintiff knew Sedgwick was in charge of determining his LTD eligibility. Finally, one of these documents included the disability definition from the plan, so Mr. Johnson's argument that "there is an incomplete definition of disability," ECF No. 53 at 20, is unavailing. *See* ECF No. 28 at 213.

### 2. Whether there were procedural irregularities warranting de novo review

Having established that HP's plan properly vested discretion in Sedgwick, I turn next to whether de novo review is still appropriate given alleged procedural irregularities. This Circuit has held that the de novo standard applies where the plan administrator's compliance with ERISA is plagued with one or more procedural irregularities, even when an administrator has discretionary authority. *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 825 (10th Cir. 2008). These circumstances typically involve an administrator's violating ERISA's timeliness requirement or failing to issue a decision on a claim altogether. *See, e.g.*, *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1316 (10th Cir. 2009) (applying de novo review where administrator failed to render a final decision within ERISA's temporal limits); *Gilbertson*

*v. Allied Signal, Inc.* 328 F.3d 625, 632 (10th Cir. 2003) (reviewing de novo where insurer never decided appeal, and there was thus "no actual exercise of discretion or application of reasoned judgment to which a court can defer."); *LaAsmar*, 605 F.3d at 798–99 (applying de novo standard where insurer issued decision in three times the timeline permitted under ERISA).

Here the alleged procedural irregularity does not implicate the timeliness of Sedgwick's decision, nor does plaintiff argue that Sedgwick failed to make a determination at all. Instead, the single procedural irregularity he points to is Sedgwick's failure to send a copy of the SPD after his requesting it pursuant to 29 U.S.C. § 1024(b)(4). ECF Nos. 57 at 4; 29-1 at 22.

The Tenth Circuit's decision in *Gilbertson* contemplates that de novo review can apply when there are procedural irregularities other than those involving deadlines. *Gilbertson*, 328 F.3d at 634. The Tenth Circuit has remanded for such procedural issues, such as an insurer's failure to inform a claimant that his appeal was denied—an irregularity that in turn generated an incomplete administrative record for the court to review. *See Messick v. McKesson Corp.*, 640 F. App'x 796, 799 (10th Cir. 2016) (unpublished). Other courts have too. *E.g.*, *Benedetti v. Schlumberger Tech. Corp.*, No. CIV-18-614-R, 2020 WL 61048, at *5 (W.D. Okla. Jan. 6, 2020) (remanding when insurer switched claim administrators, and second administrator never decided plaintiff's claim); *Young v. Berg*, No. 16-CV-03151-CMA-KMT, 2018 WL 9372463, at *6 (D. Colo. Sept. 17, 2018) (using de novo standard when plaintiff "allege[d] substantial violations of the procedural requirements of ERISA, such as its notification requirements, and resulting harm to her," and plan administrator was not solely interpreting its own plan).

Nonetheless, I find that the procedural irregularity plaintiff alleges here does not warrant de novo review. There is no dispute that neither Sedgwick nor HP provided the SPD to Mr.

Johnson, and that this violated an express provision of ERISA. *See* 29 U.S.C. § 1024(b)(4). But this procedural violation did not involve a failure of an administrator to exercise its discretion in deciding a claim, as was the case in *Messick*, *Benedetti*, and *Gilbertson*. Nor did the situation here involve a "substantial" procedural irregularity that caused "resulting harm" to plaintiff, as in *Young*. Mr. Johnson tries to argue that this omission prejudiced him by explaining that he would have had "much greater impetus" to procure his own vocational evaluation to counter the Meyers Report had he possessed the plan with its full definition of disability. ECF No. 57 at 6–7. The Court does not buy this alleged "prejudice." Mr. Johnson had this full definition at least as early as December 15, 2017 when he received the letter from Sedgwick about its process for evaluating his LTD claim—well before the March 2018 Meyers Report. ECF No. 28 at 213–14. Furthermore, Mr. Johnson identified an actual error in the Meyers report which he claims is itself sufficient for remand. ECF No. 53 at 18–19. If that serious error did not push him to get his own vocational evaluation, it is hard to imagine anything else from the report would have.

Mr. Johnson also did not raise this procedural irregularity until his motion for summary judgment. It is not mentioned in his various communications with Sedgwick following his request. *E.g.*, ECF Nos. 28-5 at 78; 28-6 at 58; 28-7 at 13, 24, 33, and 76 (letters from plaintiff's counsel to Sedgwick). Nor did he ever argue to Sedgwick or the Court that the administrative record was incomplete for failure to include the SPD. I therefore find that this procedural irregularity is not sufficiently serious to warrant de novo review of this claim.

3. <u>Whether less deference is warranted due to procedural irregularities</u>

Plaintiff's final argument is that I should afford the Sedgwick's decision less deference because of this procedural irregularity. Even if the arbitrary and capricious standard applies,

"when a serious procedural irregularity exists, and the plan administrator has denied coverage, an additional reduction in deference is appropriate." *Fought v. UNUM Life Ins. Co. Of Am.*, 379 F.3d 997, 1006 (10th Cir. 2004). Mr. Johnson argues that Sedgwick and HP's failure to send him the SPD means I should reduce my deference to the benefits denial decision. In my analysis above I already found that this violation of 29 U.S.C. § 1024(b)(4) was not serious. I similarly conclude here that no reduction in deference is warranted based on this irregularity. I thus assess Mr. Johnson's claim on the merits under the arbitrary and capricious standard.

**B.  Analysis of plaintiff's claim**

When reviewing an administrator's decision, the Court can "consider only the rationale asserted by the plan administrator in the administrative record and determine whether the decision, based on the asserted rationale, was arbitrary and capricious." *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). The arbitrary and capricious standard is deferential and a "difficult one for a claimant to overcome." *Nance v. Sun Life Assur. Co. of Canada*, 294 F.3d 1263, 1269 (10th Cir. 2002). The administrator's decision will be upheld "so long as it is predicated on a reasoned basis" and supported by substantial evidence. *Adamson v. Unum Life Ins. Co. of Am.,* 455 F.3d 1209, 1212 (10th Cir. 2006). Courts look to whether "(1) the decision was the result of a reasoned and principled process, (2) is consistent with any prior interpretations by the plan administrator, (3) is reasonable in light of any external standards, and (4) is consistent with the purposes of the plan." *Flinders*, 491 F.3d at 1193 (quotations and citation omitted).

"'Substantial evidence is such evidence that a reasonable mind might accept as adequate

to support the conclusion reached by the [decisionmaker].' Substantial evidence requires 'more than a scintilla but less than a preponderance.'" *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (quoting *Flint v. Sullivan*, 951 F.2d 264, 266 (10th Cir. 1991)). If a court finds a decision is not supported by substantial evidence, remand (or more rarely, granting of benefits) is appropriate. A court may also reverse "when an ERISA administrator fails to make adequate findings or to explain adequately the grounds of her decision . . . ." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1288 (10th Cir. 2002). In that case, the remedy is "to remand the case to the administrator for further findings or explanation." *Id.*

### 1. Criticisms of the independent medical examinations

Mr. Johnson's first argument is that the IMEs on which Sedgwick relied—Drs. Ramaswamy and Broghammer—made multiple errors in their reports. For example, plaintiff points out that Dr. Ramaswamy failed to account for what his treating doctors said about his RA medication, that he failed to review Dr. Corbett's RFC report and medical records from National Jewish, that he omitted "key evidence" such as two statements by Corbett from July 2017, that he "cherry-picks" physician records, and that he fails to understand that RA symptoms are variable. Plaintiff then attacks Dr. Broghammer's report on the basis that his physical examination was less thorough, and that he "merely recite[d]" the findings from Corbett's RFC report and Ms. Couch's FAE report without commenting on them. ECF No. 53 at 12, 15–18.

These criticisms are without merit. To start, ERISA does not require plan administrators to accord special deference to opinions of treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Thus Dr. Ramaswamy, and by extension Sedgwick (who reviewed the records including Ramaswamy's), could put more weight on his own physical

examination than the notes of treating physicians like Drs. Noble and Corbett. The records from National Jewish and Corbett's RFC all post-date this IME, so it would have been impossible for Dr. Ramaswamy to review them. His omission of two statements from a July 2017 report are not an error, as it would be unhelpful for Dr. Ramaswamy to recite every single line from every medical report regarding plaintiff's RA. Instead, he appropriately summarized what he believed was important. There is also no evidence of "cherry-picking." The report reviews all the records available to Dr. Ramaswamy at the time of the IME, and his conclusion is based on the lack of synovitis present in Mr. Johnson's joints. *See* ECF No. 31-10 at 107. The fact that this IME did not explicitly mention variability in synovitis and RA symptoms does not render his ultimate conclusion faulty, much less Sedgwick's implicit reliance on it arbitrary and capricious.

As for Dr. Broghammer, he too conducted a thorough review of plaintiff's medical records, including the National Jewish notes and Corbett's RFC report. Plaintiff points to no requirement that an IME must conduct a physical examination of a claimant in any particular detail. Moreover, Dr. Broghammer's physical examination was consistent not only with Dr. Ramaswamy's examination, but also with treatment notes from Dr. Corbett visits in May and June (noting significant improvement in pain and swelling), the visit with Dr. Theis in late June (noting no acute or chronic synovitis), and Dr. Noble in late July (also noting no acute or chronic synovitis). Though Ms. Crouch and Dr. Amigues both wrote that plaintiff was experiencing joint swelling and redness in August, this is consistent with Dr. Broghammer's assessment that synovitis and other RA symptoms are variable—the exact finding that plaintiff criticized Dr. Ramaswamy for not reporting. The medical records I have summarized above show an improvement in plaintiff's objective and subjective symptoms over time, and thus it makes sense

that both IMEs found his condition to be inactive in 2018 despite its severe and acute status at the time of diagnosis in 2016.  Finally, Dr. Broghammer was not required to comment on the RFC and FAE reports in any particular way to show that he considered them.  He explained why he disagreed with the restrictions suggested by plaintiff's other physicians.  That is sufficient.

In sum, plaintiff has failed to show that Sedgwick's (and in turn HP's) decision was arbitrary and capricious to the extent it relied on the two IMEs.  Though certainly a different IME could have come to a different conclusion about whether Mr. Johnson's RA was active enough to warrant further restrictions, that is not the applicable standard here.

### 2.  Errors in the Meyers Report

Plaintiff's next argument is that Sedgwick's reliance on the Meyers Report for his employability is misguided because there is a critical error on which the report bases its conclusion—it translates 20 minutes on, 20 minutes off of typing into "keyboarding up to 40 minutes per hour which would equate to a full, frequent range of keyboarding."  ECF No. 29-2 at 2.  Mr. Johnson contends that this reading assumes he can type for 40 minutes of every hour, or 5.33 hours per day, when in fact the restriction means he can type an average of 30 minutes per hour, or only 4 hours per day.  ECF No. 57 at 2.  HP urges this Court to read the Meyers Report as correct because 20 minutes on and 20 minutes off could indeed mean "up to" 40 minutes per hour.  ECF No. 54 at 7 n.6.  I agree with plaintiff here.  A natural reading of "up to 40 minutes per hour" means that for *every* hour, not just the first one, plaintiff can type 40 minutes.  It is clear to me that Mr. Meyers made a mistake here, and that a shift from 5.33 hours to 4 hours of typing in an 8-hour workday could make a substantial difference in plaintiff's employability in various computer-based jobs like his own prior role.

Even more importantly, however, the Meyers Report inadequately explains how or why it concludes that plaintiff can perform both his former role and that of Global Manager despite this substantial typing restriction. The physical description of Mr. Johnson's former role of SVC ITO Service Delivery was a "typical office job" that involved no lifting or carrying. The actual job duties encompassed a long list of tasks such as "[d]evelops and fosters senior management relationships" and "[d]evelops and manages account service delivery plan," none of which include any description of physical requirements or how the work should be done, such as time spent typing, time spent scrolling with a mouse, time spent on the phone, or time spent attending meetings and writing notes by hand. As for the Global Manager position that plaintiff can purportedly perform, there is no description of its job duties or physical requirements in the Meyers Report at all, nor anywhere in the administrative record. In fact, nowhere have I located any mention of the minutes per day typing requirements for either role.

While I suspect it is atypical for these types of job descriptions to include minutes of typing requirements, that information seems essential to the LTD benefits analysis that must be done here. If Mr. Johnson could perform the majority of his job duties using a phone and computer mouse, then his typing restriction would not prevent him from working in these roles. If instead the roles require communicating entirely by email or other forms of messaging, his typing restriction would likely be prohibitive. HP's Disability Plan only finds someone is disabled under phase (iii) if he is "unable to perform" any occupation. ECF No. 54-4 at 12. My impression is that someone whose job requires spending 100% of his time on a computer, as an IT job seems to require, cannot perform that occupation if he can only type for 20 minutes at a time, and only 4 hours overall in a day. Perhaps I am wrong. But what matters is that I simply

cannot assess, based on the record before me, whether Mr. Johnson is able to perform the two occupations that the Meyers Report said he could do. Nor do I believe Mr. Meyers could have properly answered this question himself based on the information he was provided.

The reason these omissions and flaws are so important is because Sedgwick relies entirely on the Meyers Report's employment analysis and conclusion in determining that plaintiff can perform some occupations and thus is not disabled. *See* ECF No. 30-8 at 207. Its own final disability determination includes no additional information on the ITO Service Delivery job nor the Global Manager job, nor why he was "able to perform" these roles given his typing restrictions as required by the plan. The Tenth Circuit has held that "a well-reasoned benefits decision must consider all essential job duties." *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 998 (10th Cir. 2018) (citing *Caldwell*, 287 F.3d at 1285). Another district court in this circuit has remanded when a claims administrator relied on physician conclusions that did not consider all of the plaintiff's job requirements as required under *Caldwell*. *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 161 F. Supp. 3d 1069, 1079 (N.D. Okla. 2016) (noting that Sedgwick, also the claims administrator in that case, "relied exclusively on the reports of its PAs" in denying benefits, "none of which expressly considered [plaintiff's] ability to perform the cognitive or travel requirements of his position.").

I conclude here that remand is appropriate. Sedgwick and HP have failed "to explain adequately the grounds of [their] decision." *Caldwell*, 287 F.3d at 1288. The Court has deferred to the administrator's conclusions about the severity of Mr. Johnson's RA, even though other decisionmakers could find that his condition is more severe. This deference is appropriate under the arbitrary and capricious standard. The Court similarly defers to the IMEs' translation of

plaintiff's RA into the 20-minute typing restriction.  But the Court cannot defer to an overall determination that Mr. Johnson is not disabled when it is based on a flawed translation of this typing restriction into Mr. Johnson's ability to work.

The Meyers Report's interpretation of this typing restriction in terms of Mr. Johnson's employability is *the* critical step in determining whether he is disabled.  Sedgwick's final denial parrots the Meyers Report wholesale without critiquing its reasoning.  But the report never explicitly assessed whether plaintiff's typing restriction made him unable to perform his former job, the Global Manager role, or any other occupation as required by the plan.  It could not have—we have no idea how much typing is required for either role.  Further, even if the Meyers Report had assessed Mr. Johnson's ability to work based on his typing restriction, it would have done so with the wrong restriction—it operated under the assumption that plaintiff was restricted to typing only 2/3 of his workday instead of 1/2, a substantial difference.  The administrator's failure to consider this error and failure to account for the report's inadequate analysis based on the typing restriction was arbitrary and capricious.  Its decision was not "the result of a reasoned and principled process."  *Flinders*, 491 F.3d at 1193.  There is simply not enough evidence or analysis to support the ultimate conclusion that plaintiff can perform the two roles in question.

## ORDER

The Court reverses Mr. Johnson's denial of benefits and remands for the administrator to accurately consider plaintiff's functional limitations and to adequately explain its reasoning in its final determination.  Plaintiff's motion for summary judgment [ECF No. 53] is thus GRANTED.


DATED this 3rd day of June, 2021.

BY THE COURT:

R. Brooke Jackson
United States District Judge